UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>VINCENT GERALD GARCIA and JORGE JASSO,<br><br>　　　　Defendants. | Case No. 18-cr-00466-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EXPERT TESTIMONY**<br><br>[Re: ECF No. 536] |

The two remaining Defendants in this case, Vincent Gerald Garcia and Jorge Jasso, are alleged to be members of a criminal racketeering enterprise consisting of Nuestra Familia and Salinas Norteño gang members who participated in various violent crimes in Monterey County Jail. *See* ECF No. 1 ("Indictment"). Garcia and Jasso now move under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 526 U.S. 579 (1993), and the Federal Rules of Evidence to exclude or limit the testimony of the government's proffered gang experts, Special Agent Edgar Ramos and Investigator Nicolas Reyes.[1] *See* ECF No. 536 ("Motion").

For the reasons discussed on the record at the hearing on October 5, 2021, and set forth below, Garcia and Jasso's Motion is GRANTED IN PART and DENIED IN PART. The Government's experts will only be allowed to provide testimony in the Government's case-in-chief regarding certain gang colors, slang, code, signing, and select basic background information. All other proffered testimony is either irrelevant or invades the fact-finding province of the jury.

---

[1] This issue is also the subject of Garcia and Jasso's first motions *in limine*. *See* ECF Nos. 608, 615. This order also resolves those motions.

## I. BACKGROUND

The Indictment in this matter was filed on September 27, 2018. *See* Indictment. It charges fifteen individuals as members of a criminal enterprise, consisting of members and associates of the Nuestra Familia prison gang and Norteño street gangs in Salinas, California and the surrounding areas (the "Enterprise"). *Id.* ¶ 40. Among other activities, members and associates of the Enterprise are alleged to have committed crimes such as attempted murder, narcotics trafficking, and other acts of violence. *Id.* ¶ 41.

On March 22, 2021, pursuant to Fed. R. Crim. P. 16(a)(1)(G), the government produced a letter providing the opinions, bases, and methodologies of the government's gang experts, Special Agent Ramos and Investigator Reyes. *See* ECF No. 536-1. Garcia and Jasso filed a motion to exclude or limit their testimony, *see* Motion, and the government opposed, *see* ECF No. 537 ("Opp."). The Court held a first hearing on the Motion on July 22, 2021.

Following the hearing, the government compiled an amended disclosure listing the opinions that its gang experts would offer at trial. *See* ECF No. 553 ("Amd. Discl.").[2] The government's disclosure states that Special Agent Ramos intends to offer the following 29 opinions:

(1) In or about 1957, prisoners in the California state prison system banded together to form a gang that would eventually be called the Mexican Mafia, also known as "M" or "*La Eme*." The Mexican Mafia was (and remains) principally composed of Mexicans and Mexican-Americans with roots in Southern California and Mexico. Although originally organized under *La Eme*'s banner, Mexican and Mexican-American prisoners from Northern California—many of whom were born in the United States and who came from the farms of the Central Valley instead of the urban sprawl of Los Angeles—eventually grew to feel increasingly marginalized and even persecuted in a gang dominated by southerners. Accordingly, after numerous violent prison clashes between northerners and southerners, in the late 1960s, northerners formed the prison gang that eventually became known as *Nuestra Familia* ("NF")—Spanish for "Our Family"—as a rival to *La Eme*. To this day, the NF and *La Eme* are rivals within prison, where the two sides must be kept apart to avoid bloodshed.

(2) The NF is organized like the Mexican Mafia; however, the NF is paramilitary and utilize a rank and structure within their organization. Its membership is composed of a relatively small number of male members, known as "*carnales*," who control the gang and handle important managerial decisions. The highest ranking *carnales*

---

[2] The Court will refer to individual opinions disclosed in this document by witness name and opinion number, *i.e.*, "Ramos Op. 1" or "Reyes Op. 2".

are responsible for writing any amendments to NF's Constitution, establishing its rules, and making decisions of strategic significance. A *carnale* ostensibly must pledge allegiance to the NF above all else, even above family and friends.

(3) As a response to the prison gang problem in the California prison system, the CDCR initiated its Secure Housing Units ("SHU") programs in its prison facilities. The CDCR identified prison gang leaders in a particular facility, removed them from the prison's mainline housing units, and placed them into segregated SHU cells. The goal of the SHU programs was to limit the influence of prison gang leaders by isolating them, thereby restricting their communications and their ability to direct criminal activities of other gang members in and out of CDCR custody.

(4) By the 1980s, the majority of NF *carnales* had been placed in SHU programs or other lockup units, which limited the prison gang's membership numbers and its influence within the CDCR. As a response to NF *carnales* being removed from the general prison population, NF created a separate gang called *Nuestra Raza* (Spanish for "Our Race"), also known by the letters "NR." The NF gave *Nuestra Raza* members a set of rules, known as the "Fourteen Bonds" that governed their conduct and educated them in carrying out NF's orders. *Nuestra Raza* members eventually became the "foot soldiers" for NF and also provided a larger recruiting pool to the NF by preparing inmates for NF membership. Because *Nuestra Raza* was not yet classified as a prison gang, its members were not automatically segregated into SHU programs. Through the *Nuestra Raza*, NF *carnales* were able to restore their control within the CDCR. By the 1990s, *Nuestra Raza* had grown in size and power and also became known as the Northern Structure or "NS."

(5) Norteños are gang members who are generally from Northern California, who fall under the umbrella of the NF in that Norteños pledge their allegiance and loyalty to the NF. Norteños are instructed on the rules, rituals, and obligations of the NF. As noted above, a select few Norteños become *carnales* of NF. Others are elevated to Northern Structure, which is mid-level management for NF. All others are "Northerners," who are Norteño street gang members without higher status in the NF or Northern Structure.

(6) The NF has a written constitution drafted by its highest ranking *carnales* that sets forth its purpose and ideology, its rules, its symbols, its rituals, and its organizational structure. As noted above, the *Nuestra Raza* follow the "Fourteen Bonds."

(7) NF *carnales* control and direct the activities of other criminals, including members of various Norteño street gang members in the community outside of prison. NF is able to assert control and influence over Norteño gang members outside the prison system primarily because the Norteño gang members want the protection provided by NF if they ever become incarcerated.

(8) Norteños who are part of the Northern Structure refer to each other as "*hermanos*", "bros.", "Norteño soldados" or "N-Sols" and new *carnales* are pulled from the ranks of Norteños and the Northern Structure who have proven their loyalty to NF by committing crimes for the gang's benefit.

(9) In custodial settings, all Norteños work together to maintain the structure and follow the rules of the NF without regard to what specific clique they are from. The rules are more strictly enforced while incarcerated than on the streets. The result is a military-style environment in Norteño custodial housing units and among Norteños in prison or jail yard areas.

3

(10) Upon arrival to a Norteño housing unit, each Norteño is required to provide his information in the form of a New Arrival questionnaire. This information is then disseminated among all active Norteño housing units in the facility to vet the new arrival's standing within the gang. The vetting process is meant to identify informants, rival gang members, and members who have violated gang rules or not in good standing. While the vetting process is ongoing, the new arrival is guarded and his movements are restricted. Once cleared, the new arrival becomes an active member of the housing unit, which is often referred to as the "Household." He agrees to comply with the rules of the Household, which are based on the rules of the NF.

(11) In custodial settings, Norteños are educated and taught to strictly follow NF rules and procedures. All new Norteño inmates are educated on the "Fourteen Bonds" when they go into custody, as well as other gang policies and procedures. The result is a military-like environment in which there is a strict code of conduct as well as commanding officers and subordinates. For example, Norteños adhere to group calisthenics regimens and study gang rules and regulations taught to them by more experienced or senior gang members. Other rules govern how members should conduct themselves in a particular custodial environment, including, for example, how they should dress, how they should keep their beds, and what bathrooms they should use. Norteños are also educated regarding best practices for removals (discussed more fully below in paragraph 14) and for smuggling controlled substances into the custodial facility, how the drugs and any money made from them are divided between the NF and others in the housing unit, and how to smuggle the controlled substances to other parts of the custodial facility.

(12) In custodial settings, Norteños are often assigned particular jobs. Some examples include the following. A "maestro" and Norteño teacher work together to create educational programs on NF/Northern Structure rules and procedures, which include assigning essays to household members. Certain members are also designated security details for the gang. Other members are designated to assist with passing kites to and from other housing units or locations in the jail or prison.

(13) If a Norteño arrives at a custodial facility or housing unit that does not have a preexisting Norteño presence, it is the responsibility of that member to establish an NF/Northern Structure-style program in that part of the facility. Norteños are taught that the program should adhere to NF/Northern Structure rules and include setting up lines of communication with other Norteño housing units, gathering information about new Norteños (i.e., new arrivals), documenting incidents in the housing unit, and establishing a workout regimen and education program.

(14) If a member fails to follow the rules, he may be subject to "removal" from the housing unit. The NF teaches that the goal of a "removal" is murder, but the gang also teaches that the attackers should attempt to avoid being caught by prison or jail guards. That means time and circumstances will dictate the action taken by individual gang members. A "removal" is imposed for a serious rule violation, such as "red-on-red" violence, endangering NF members, or attempting to drop out of the gang. It involves the stabbing of the target by a "hitter" followed immediately by a physical assault without weapons by multiple individuals called "bombers." Bombers inflict more serious injuries by opening stab wounds and also buy the hitter time to get rid of a weapon and wash himself off before correctional officers arrive. Removals are approved in advance by the Norteño in charge of the facility (unless an emergency arose that required the immediate removal of an individual), after receipt of reports of the violations from members in the housing unit. The removals are planned out by the person in charge of the particular housing unit. All

4

        members of the housing unit are aware of the removal process, and they are required to assist in the removal if requested.

(15) While in custody, Norteños receive specific training about removals in their educational programs. Training materials consist of micro writings that are copied and transmitted and include an anatomy chart to maximize the infliction of harm on a victim and how to manufacture weapons. The anatomy chart specifies the best points on the body where somebody should be stabbed in order to maximize the chances of killing a victim. They include the throat, the carotid artery, the temple, and locations of main arteries in the eye socket. The training materials also teach how to manufacture weapons out of razor blades, electrical tape, saran wrap, plastic tray covers from the food trays, materials smuggled in by incoming inmates, electrical plates, or metal. Inmates are also taught how to dispose of weapons (flushing them down the toilet) and how to move them from one housing unit to the other.

(16) In custodial settings, NF/Northern Structure gang members and Norteños write "incident reports" that document and report rules violations by other gang members. Members maintain logs of these incident reports and passes on information to other Norteños in custody. Members also conduct internal gang investigations and holding hearings regarding rules violations.

(17) One of the most important rules of the NF gang is that gang members are expected to retaliate against or kill (1) former gang members ("drop-outs") known to be cooperating with the government and who have violated the gang's "code of silence," and (2) former or current gang members who violate any of the principles of the NF's "Constitution" and the Northern Structure's "Fourteen Bonds." One such form of retaliation in custodial environments is the "removal" of a current or former gang member.

(18) NF gang directives and rules are communicated from prison and jail within other parts of the prison or jail, to other prisons and jails, and to people on the streets in a variety of ways including: telephones, "kites," handwritten letters, third party communication, and sign language. "Kites" are miniature writings that typically contain or seek information about certain gang members: status, true name, date of birth, commitment offense, "clique", or housing prison. Kites often pass through the hands of multiple individuals and are hidden in the jail facility to reach their intended destination. NF/Northern Structure gang communications are also conveyed through coded letters, complicit visitors, smuggled cellular phones, and three-way telephone calls. Communications can be informative or a directive. They can contain directives from higher ranking members to others, or they can seek and spread information. Kites can inform gang members as to the status of other gang members, including whether gang members are deemed "no good," on the "green light list," on the "bad news list," or otherwise in bad standing with the gang. "Green Light" is a term that is used when a Norteño gang member, or an entire clique, is authorized to be attacked and killed by fellow Norteños. It is the result of a violation of the rules and a finding by the gang higher ups that a serious violation has occurred warranting the "Green Light." Communications, including kites, are often smuggled into and out of prisons and jails by prisoners and complicit visitors. Kites are sometimes concealed by inmates in body cavities. These types of communications allow incarcerated NF members to communicate with and direct other incarcerated members and associates, as well as to communicate with and direct members and associates on the streets.

(19) Outside of prison, NF and *La Eme* compete for control of lucrative illegal activities such as drug dealing, which has led to violence on the streets. Indeed, gang

members—especially younger gang members looking to prove themselves and to elevate their status within the gang—associated with either side often engage in otherwise unprovoked violence against individuals merely suspected of being affiliated with the other side.

(20) Outside of prison, NF is organized in a particular geographic territory into "regiments," or crews of members and associates who commit crimes for the gang's benefit. A regiment is led by a regiment commander, who is an NF *carnal*. A street regiment commander, who is usually another NF member or high-ranking Norteño, reports up to the regiment commander. Some *carnales* command more than one NF regiment. The rank and file of an NF regiment are called "manpower" or "soldiers/soldados" and are usually Norteños and "Northerners" (street gang members who claim general affiliation with NF, but who have not yet become Norteños). Among other things, the street regiment commander is responsible for overseeing the criminal activities of his regiment, collecting his regiment's criminal proceeds, and—after keeping his appropriate share—transferring a portion of the criminal proceeds to the NF regiment commander via thirty-party accounts and other means

(21) Norteño street gangs are organized into smaller cliques or "hoods" based on the local neighborhoods where their members reside or are actively engaged in gang activity. Each Norteño clique has a name and its members and associates meet and work together to "put in work" or carry out their illegal activities for their own individual benefit, the benefit of the particular Norteño clique, the benefit of Norteños generally, and the benefit of NF.

(22) Norteño street gang members often socialize with Norteño gang members from other neighborhoods, not just with other Norteños in their own particular clique.

(23) Within the ranks of Norteños, gang members earn promotion and prestige by proving themselves through the commission of criminal activities benefitting the gang and/or by spending time in jail or prison. Norteños commit crimes such as robbery, extortion, and narcotics trafficking to enrich themselves and NF. Each of these activities affect interstate commerce.

(24) Norteños pay a portion of their illicit proceeds as a "tax" or "contribution" to NF *carnales*.

(25) Norteños also engage in acts of violence, including murder and attempted murder, against their rivals, most notably Sureños. Such violence is the quickest way to earn prestige for the individual gang member, his clique, Norteños in general, and NF.

(26) Norteños identify themselves with the color red, the number "14" and/or the Roman numeral "XIV." The number "14" corresponds with the letter "N," which is the fourteenth letter of the alphabet; which, in turn, is a symbol of Northern Structure, who are NF affiliates. As with the number "14" and the Spanish word "Norteño," "Norte" is commonly, but not exclusively, displayed by Norteño criminal street gang members in tattoos, graffiti, drawings, hand signs, and on clothing as a way of displaying their affiliation, loyalty, and commitment to the gang. A "Huelga bird" may be a very good indicator of a member's association with Northern Structure which is governed by the NF. The depiction of a sombrero with a knife through it is a symbol of the NF. Only a carnale is allowed to get such a tattoo.

(27) Norteños often use code words and slang terms to disguise criminal activities, such as the use of "thang" (firearm), "whips" (cars), and "Scraps" (Sureños). Common

slang terms, including slang in kites, are "la casa," which references active Norteno housing units, "per C authority," which refers to the carnal in charge or at the specific direction of the NF, and "Reg Authority," which refers to Regiment Authority, the person in charge of a territory/area on behalf of the NF.

(28) Despite the efforts of law enforcement officials, the NF/Northern Structure continues to flourish and has expanded their influence over illegal activities outside of the prison system. After NF/Northern Structure members or associates (including Norteño street gang members) are released from prison, they remain loyal to NF/Northern Structure and work to further the goals of NF/Northern Structure outside of the prison environment. Despite being imprisoned and being closely scrutinized by prison officials, NF *carnales* still manage to convey their orders to NF/Northern Structure members and associates throughout the prison system and outside of prison through a variety of means, including through kites. If a person has a large number of gang kites in their home, that person is in a leadership position for NF.

(29) Salinas and Monterey County Jail, as well as greater Monterey County, have historically been strongholds for NF, Northern Structure, and Norteño street gang members. The Norteno gang activity at Monterey County Jail is respected by Norteno gang members from outside of Salinas because it is viewed as particularly well-run, regimented, and disciplined.

*Id.* Investigator Reyes intends to offer the following 24 opinions:

(1) Nuestra Familia (NF) is a prison gang composed largely of Hispanic males from Northern California. Its main rival is a prison gang known as the Mexican Mafia.

(2) Norteños are gang members who are generally from Northern California, who pledge their allegiance and loyalty to the NF, and who have been instructed on the rules, rituals, and obligations of the NF. Norteño street gangs fall under the umbrella of the NF.

(3) The city of Salinas and the Monterey County Jail, as well as Monterey County generally, have historically been strongholds for Nuestra Familia and Norteño members. The gang activity at Monterey County Jail is respected by members in other locations because it is viewed as particularly regimented and disciplined.

(4) The NF is organized like the Mexican Mafia; however, the NF is paramilitary and utilize a rank and structure within their organization. Its membership is composed of a relatively small number of male members, known as "*carnales*," who control the gang and handle important managerial decisions.

(5) The NF has a written constitution drafted by its highest ranking *carnales* that sets forth its purpose and ideology, its rules, its symbols, its rituals, and its organizational structure. The *Nuestra Raza* also known as the Northern Structure, which are essentially middle management for the NF, as well as Norteño street gangs, follow the "Fourteen Bonds."

(6) NF *carnales* control and direct the activities of other criminals, including members of various Norteño street gang members in the community outside of prison. NF is able to assert control and influence over Norteño gang members outside the prison system primarily because the Norteño gang members want the protection provided by NF if they ever become incarcerated.

7

(7) Norteños who are part of the Northern Structure refer to each other as "*hermanos*", "bros,", "Norteño soldados" or "N-Sols" and new *carnales* are pulled from the ranks of Norteños and the Northern Structure who have proven their loyalty to NF by committing crimes for the gang's benefit.

(8) In custodial settings, all Norteños work together to maintain the structure and follow the rules of the NF without regard to what specific clique they are from. The rules are more strictly enforced while incarcerated than on the streets. The result is often a military-style environment in Norteño custodial housing units and yard areas that the gang members themselves create and enforce. This was true during the relevant time period to this case at Monterey County Jail.

(9) Upon arrival to a Norteño housing unit, each Norteño is required to provide his information in the form of a New Arrival questionnaire, which is sometimes referred to as a "Seven-by-Seven" if there are seven questions or a "Five-by-Five" if there are five questions. This information is then disseminated among all active Norteño housing units in the facility to vet the new arrival's standing within the gang. The vetting process is meant to identify informants, rival gang members, and members who have violated gang rules or not in good standing. While the vetting process is ongoing, the new arrival is guarded and his movements are restricted. Once cleared, the new arrival becomes an active member of the housing unit, which is often referred to as the "Household." He agrees to comply with the rules of the Household, which are based on the rules of the NF. This was true during the relevant time period to this case at Monterey County Jail.

(10) In custodial settings, Norteños are educated and taught to strictly follow NF rules and procedures. All new Norteño inmates are educated on the Fourteen Bonds when they go into custody, as well as other gang policies and procedures. The result is a military-like environment in which there is a strict code of conduct as well as commanding officers and subordinates. For example, Norteños adhere to group calisthenics regimens and study gang rules and regulations taught to them by more experienced or senior gang members. Other rules govern how members should conduct themselves in a particular custodial environment, including, for example, how they should dress, how they should keep their beds, and what bathrooms they should use. Norteños are also educated regarding best practices for smuggling controlled substances into the custodial facility, how the drugs and any money made from them are divided between the NF and others in the housing unit, and how to smuggle the controlled substances to other parts of the custodial facility. This was true during the relevant time period to this case at Monterey County Jail.

(11) In custodial settings, Norteños are often assigned particular jobs. Some examples include the following. A "maestro" and Norteño teacher work together to create educational programs on NF rules and procedures, which include assigning essays to household members. Certain members are also designated security guards for the gang. Other members are designated to assist with passing kites to and from other housing units or locations in the jail or prison. This was true during the relevant time period to this case at Monterey County Jail.

(12) If a member fails to follow the rules, he may be subject to "removal" from the housing unit. The NF teaches that the goal of a "removal" is murder, but the gang also teaches that the attackers should attempt to avoid being caught by prison or jail guards. That means time and circumstances will dictate the action taken by individual gang members. A "removal" is imposed for a serious rule violation, such as "red-on-red" violence, endangering NF members, or attempting to drop out of the gang. It involves the stabbing of the target by one individual followed

immediately by a physical assault without weapons by multiple other individuals called "bombers." Bombers inflict more serious injuries by opening stab wounds and also buy time for the individual who stabbed the victim to get rid of a weapon and wash himself off before correctional officers arrive. Removals are approved in advance by the Norteño in charge of the facility (unless an emergency arose that required the immediate removal of an individual), after receipt of reports of the violations from members in the housing unit. The removals are planned out by the person in charge of the particular housing unit. All members of the housing unit are aware of the removal process, and they are required to assist in the removal if requested.

(13) Norteños receive specific training about removals in their educational programs in custody. Training materials consist of micro writings that are copied and transmitted and include an anatomy chart to maximize the infliction of harm on a victim and how to manufacture weapons. The anatomy chart specifies the best points on the body where somebody should be stabbed in order to maximize the chances of killing a victim. They include the throat, the carotid artery, the temple, and locations of main arteries in the eye socket. The training materials also teach how to manufacture weapons out of razor blades, electrical tape, saran wrap, plastic tray covers from the food trays, materials smuggled in by incoming inmates, electrical plates, or metal. Inmates are also taught how to dispose of weapons (flushing them down the toilet) and how to move them from one housing unit to the other, including through the toilet system.

(14) In custodial settings, NF gang members and Norteños write "incident reports" that document and report rules violations by other gang members. Members maintain logs of these incident reports and passes on information to other Norteños in custody. Members also conduct internal gang investigations and holding hearings regarding rules violations.

(15) One of the central tenets of the NF gang is that gang members are expected to retaliate against or kill (1) former gang members ("drop-outs") known to be cooperating with the government and who have violated the gang's "code of silence," and (2) former or current gang members who violate any of the principles of the NF's "Constitution" and the Northern Structure's "Fourteen Bonds." One such form of retaliation in custodial environments is the "removal" of a current or former gang member.

(16) Directives and rules are communicated from prison and jail to other prisons and jails and to people on the streets in a variety of ways including: telephones, "kites," handwritten letters, and third party communication. "Kites" are miniature writings that typically contain information about certain gang members: status, true name, date of birth, commitment offense, "clique", or housing prison. Communications can be informative or directive. They can contain directives from higher ranking members to others, or they can seek and spread information. Kites can inform gang members as to the status of other gang members, including whether gang members are deemed "no good," on the "green light list," or otherwise in bad standing with the gang. Communications, including kites, are often smuggled into and out of prisons and jails by prisoners and complicit visitors. Kites are sometimes concealed by inmates in body cavities. These types of communications allow incarcerated NF members to communicate with and direct other incarcerated members and associates, as well as to communicate with and direct members and associates on the streets.

(17) At the Monterey County Jail, as with other prison and jail facilities, new inmates go through a classification process. During the classification process, inmates are

asked about their gang affiliations. The classification unit uses answers to determine a housing assignment for that inmate. The questions about gang affiliation during the classification process are meant to promote inmate safety and facility security.

(18) During the relevant time period in this case at the Monterey County Jail, K-Pod was a housing unit that housed exclusively Norteño member and associates. K-Pod housing units were organized with bunk beds along the walls, a common bathroom, pay phones, and activity tables. Norteños receive a designated housing unit separate from the general prison population because of the predatory nature of Norteños. *Nuestra Familia* rules prohibit Norteños from preying upon each other. D-Pod and J-Pod was a housing unit with actual jail cells used for higher-risk Norteño and NF inmates. The inmates in D-Pod and J-Pod included NF and Norteño leaders who were charged with violent crimes or who otherwise had authority to order acts of violence in custody, so they were separated from inmates would carry out those orders.

(19) Norteños are organized into smaller cliques or "hoods" based on the local neighborhoods where their members reside or are actively engaged in gang activity. Each Norteño clique has a name and its members and associates meet and work together to "put in work" or carry out their illegal activities for their own individual benefit, the benefit of the particular Norteño clique, the benefit of Norteños generally, and the benefit of Nuestra Familia. These Norteño cliques fight with rival Sureño street gangs, and to a lesser extent other Norteño cliques, for control of territory in which to conduct narcotics trafficking and other crimes, as well as to recruit and influence non-gang members.

(20) Within the ranks of Norteños, gang members earn promotion and prestige by proving themselves through the commission of criminal activities benefitting the gang and/or by spending time in jail or prison. Norteños commit crimes such as robbery, extortion, and narcotics trafficking to enrich themselves and Nuestra Familia.

(21) Norteños pay a portion of their illicit proceeds as a "tax" or "contribution" to Nuestra Familia *carnales*.

(22) Norteños also engage in acts of violence, including murder and attempted murder, against their rivals, most notably Sureños. Such violence is the quickest way to earn prestige for the individual gang member, his clique, Norteños in general, and Nuestra Familia.

(23) Norteños identify themselves with the color red, the number "14" and/or the Roman numeral "XIV." The number "14" corresponds with the letter "N," which is the fourteenth letter of the alphabet; the letter "N," in turn, is a symbol of Nuestra Familia. As with the number "14" and the Spanish word "Norteño," "Norte" is commonly, but not exclusively, displayed by Norteño criminal street gang members in tattoos, graffiti, drawings, hand signs, and on clothing as a way of displaying their affiliation, loyalty, and commitment to the gang. The depiction of a sombrero with a knife through it is a symbol of the NF. Only a carnale is allowed to get such a tattoo.

(24) Norteños often use code words and slang terms to disguise criminal activities. These code words and slang terms include "thang," "toy," or "X-Box" to refer to a firearm; "whips" to refer to cars; "Scraps" to refer to rival Sureño gang members; "lick" to refer to a robbery; "slipping" to refer to getting caught when not paying attention, being unprofessional, or not fulfilling your duties as a gang member; and

>"rack" to refer to money (i.e. a rack of chips in Las Vegas is worth $1,000). Common slang terms, including slang terms in kites, are "la casa," which references active Norteno housing units, "per C authority," which refers to the carnale in charge.

*Id.* Garcia and Jasso filed a joint response on August 13, 2021, objecting to many of the opinions of the government's proffered experts but not their qualifications. *See* ECF No. 573 ("Resp. to Amd. Discl."). The Court discussed this Motion again at the pretrial conference on October 5, 2021.

## II. LEGAL STANDARD

As the proponent of expert testimony, the government "bears the burden of laying the proper foundation for [its] admission." *City of Long Beach v. Standard Oil Co. of Cal.*, 46 F.3d 929, 937 (9th Cir.1995). Rule 16(a)(1)(G) provides that, upon a defendant's request, the government must provide the expert's qualifications, a written summary of their expected testimony, including their opinions, and the bases and reasons for those opinions. Fed. R. Crim. P. 16(a)(1)(G). The purpose of requiring disclosure of an expert's qualifications is to provide information to the defendant and the Court in order to determine whether the expert qualifies under Federal Rule of Evidence 702. *See* Fed. R. Crim. P. 16(a)(1)(G), Advisory Committee's Note to 1993 amendment.

Federal Rule of Evidence 702 permits an expert to provide opinion testimony if "scientific, technical, or other specialized knowledge" will assist the trier-of-fact in understanding the evidence or determining a fact in issue, so long as the witness is "qualified as an expert by knowledge, skill, experience, training, or education." This rule imposes a "gatekeeping role" on the trial judge to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Testimony is "relevant if the knowledge underlying it has a valid connection to the pertinent inquiry" and "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SMQ North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quotation omitted).

To ensure reliability, a court must typically "assess the [expert's] reasoning or

methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* The Ninth Circuit has recognized, however, that in evaluating gang expert testimony, "[t]he *Daubert* factors . . . simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (admitting gang expert testimony for impeachment purposes). "[A]dmissibility of expert opinion testimony generally turns on the following preliminary question of law determinations by the trial judge under [Rule] 104(a)[:]" namely, whether (i) the opinion "is based on scientific, technical, or other specialized knowledge;" (ii) the opinion "would assist the trier of fact in understanding the evidence or determining a fact in issue;" (iii) the expert "has appropriate qualification . . .;" (iv) the expert's testimony "is relevant and reliable;" (v) the expert's "methodology or technique . . . 'fits' the conclusions;" and (vi) Rule 403 requires exclusion. *United States v. Cervantes*, 2016 WL 491599, at *4 (N.D. Cal. Feb. 9, 2016) (quoting *Hankey*, 203 F.3d at 1168).

## III. DISCUSSION

As clarified by the government's amended disclosures and Garcia and Jasso's response, Garcia and Jasso do not challenge the experts' qualifications, but rather they challenge certain opinions that the government says Special Agent Ramos and Investigator Reyes would offer at trial. Resp. to Amd. Discl. at 2-5. Defendants say that they do not object to opinions "regarding Nuestra Familia and Norteño . . . graffiti, slang, code, signing, and colors." *Id.* at 2. They do object to opinions "about gang history, structure, membership requirements, practices, rules, hierarchy, mental states of gang members, and any character evidence (or the like) regarding propensity and/or history of violence." *Id.* Defendants argue that the government is impermissibly attempting to prove facts necessary to establish elements of the RICO claims through expert testimony, and that the testimony separately violates Rules 402, 403, 702, 703, and 704(b). *Id.*

To determine which opinions would be properly offered at trial, the Court goes through each category of opinion offered by the Government's gang experts to which Defendants object.

### A. Slang, Code, Signing, and Colors

Both Special Agent Ramos and Investigator Reyes offer opinions regarding slang, code, signing, and colors used by Nuestra Familia and Norteños. "[J]ust as an anthropologist might be equipped by education and fieldwork to testify to the cultural mores of a particular social group, law enforcement officers may be equipped by experience and training to speak to the operation, symbols, jargon, and internal structure of criminal organizations." *Cervantes*, 2016 WL 491599, at *4; *see also United States v. Williams*, 2016 WL 899145, at *6 (N.D. Cal. Mar. 9, 2016) (permitting opinions regarding "common slang" and "certain hand signals, codes, and tattoos"). This testimony is appropriately limited to "those issues where sociological knowledge is appropriate"—where a layman cannot determine the issue without assistance from an expert. *See United States v. Cazares*, 788 F.3d 956, 977-78 (9th Cir. 2015); *United States v. Mejia*, 545 F.3d 179, 189 (2d Cir. 2008) (citing Fed. R. Evid. 702 Advisory Committee Note). Opinions on the meaning of so-called "coded words" are also "well established as an appropriate subject for expert testimony." *United States v. Vera*, 770 F.3d 1232, 1241 (9th Cir. 2014); *United States v. Flores*, 2014 WL 12686740, at *1 (N.D. Cal. June 16, 2014) (permitting opinions about colors, symbols, graffiti, and slang terms such as "kite," "put in work," and "jumped in").

A few of the opinions the experts offer define slang, code, signing, and colors used by Norteños and Nuestra Familia. Defendants state that they have no objection to the following opinions within that framework, and so they will be allowed:

- <u>Special Agent Ramos</u>:  opinion 26 (except the last sentence), opinion 27
- <u>Investigator Reyes</u>:  opinion 23 (except the last sentence), opinion 24

Because the following portions of opinions also define slang, code, signing, and colors, the Court DENIES Defendants' Motion to Exclude the following opinions:

- <u>Special Agent Ramos</u>
    - Opinion 8 (from "Norteños who are part . . ." to ". . . or 'N-Sols.'" ONLY)
    - Opinion 18 (from "'Kites' are miniature writings . . ." to ". . . or housing prison." ONLY)

13

- Investigator Reyes
    - Opinion 6 (from "Nortenos who are . . ." to ". . . or 'N-Sols.'" ONLY)
    - Opinion 16 (from "'Kites' are miniature writings . . ." to ". . . or housing prison." ONLY)

The Court GRANTS Defendants' Motion to Exclude the remainder of Special Agent Ramos' opinions 8, 18, and 26 and Investigator Reyes' opinions 6, 16, and 23, because those portions of the opinions contain extraneous information not related to defined concepts.

### B.   Hierarchy, Structure, and Membership Requirements

The bulk of the opinions proffered by Special Agent Ramos and Investigator Reyes involve the hierarchy, structure, and membership requirements of Nuestra Familia.  Such wide-ranging gang expert testimony risks allowing the government to "skip[] the intermediate steps" of proving facts underlying the elements of a RICO claim and have an officer "come to court and simply disgorge their factual knowledge to the jury." *See United States v. Cerna*, No. 08-cr-0730-WHA, 2010 WL 11627594, at *5 (N.D. Cal. Dec. 17, 2010) (quoting *Mejia*, 545 F.3d at 191).  To allow the government to do so would amount to "instructing the jury on the existence of facts needed to satisfy the elements of the charged offense." *Mejia*, 545 F.3d at 191; *see also Cerna*, 2010 WL 2347406, at *5 ("Juries are good at sorting out the facts, deciding, for example, what if any structure resides within a particular gang.  Juries would ordinarily rely on fact witnesses, such as cooperating witnesses and undercover officers, to supply the facts.  They do not need police opinions to do this."); *Flores*, 2014 WL 12686740, at *1 ("[P]ercipient witnesses can testify that they committed acts of violence to enhance the gang's standing, and their standing within the gang.").

Expert testimony of this nature also risks violating the Defendants' rights under the Confrontation Clause.  Expert witnesses are normally allowed to base their opinions on inadmissible facts or data "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion." Fed. R. Evid. 703; *see also Crawford v. Washington*, 541 U.S. 36 (2004) (Confrontation Clause violated where testimonial statements of available witness who did not appear at trial were admitted and defendant did not have an opportunity for cross-

14

examination). Thus, "there is generally no *Crawford* problem when an expert 'appl[ies] his training and expertise to the sources before him and reach[es] an independent judgment.'" *Vera*, 770 F.3d at 1237 (quoting *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013)). But a Confrontation Clause problem arises when the expert is "used as little more than a conduit or transmitter for testimonial hearsay, rather than a true expert whose considered opinion sheds light on some specialized factual situation." *Gomez*, 725 F.3d at 1129.

Under this framework, several courts within this district have significantly restricted the scope of expert testimony regarding the hierarchy, structure, and operations of gangs. For example, in *Cervantes*, the government offered opinions about "specific *Nuestra Familia* duties, expectations, discipline, retaliation, and the like" which are very similar to the opinions offered here. 2016 WL 491599, at *8. The court found that the opinions "appear to be solely repeating written or spoken hearsay" and that the experts were "not providing their own considered opinions in a way that would assist the factfinder." *Id.* The opinions about Nuestra Familia rules, for example, "would introduce the fact that such rules exist and how they operate without sufficiently explaining whether the officers undertook their own independent analyses of the *Nuestra Familia* 'Constitution' and other rules, how they applied their experience to reach their conclusions, or how such opinions would assist the fact-finder." *Id.* The court thus excluded the entire category of opinions about hierarchy, structure, and operations of Nuestra Familia.

The Government points to *United States v. Skates*, 2019 WL 634649 (N.D. Cal. Feb. 14, 2019), as one instance in which a court in this district permitted more expansive gang expert testimony. In *Skates*, the court held that the government's gang expert would be allowed to testify "regarding gang graffiti, slang, code, signing, tattoos, colors, symbols, areas of influence, membership rules, organizational structure, and hierarchy." *Id.* at *2. The court also stated that it would allow defendant to offer a counterexpert on similar topics because he "provide[d] important potential rebuttal evidence." *Id.* at *8. The Government has accurately characterized *Skates*, but the *Skates* court only made general pronouncements about categories of opinions that it was likely to admit at trial. The parties in that case are still litigating the contours of what precise proffered opinions will be allowed, with briefs filed just weeks ago on the very issue that this Court

15

confronts today.  *See Skates*, ECF Nos. 942 (defendants' motion *in limine* to limit gang expert testimony, citing *Cerna*, *Cervantes*, and *Williams*); 952 (government's opposition).  Because the court in *Skates* has not yet had an opportunity to engage with these principles on an opinion-by-opinion basis, the Court finds its general pronouncements less instructive and—to the extent considered without rulings on individual opinions—out of step with the weight of recent authority in the district.

Accordingly, this Court aligns with the courts in *Cerna*, *Cervantes*, *Williams*, and *Flores*, among others, that exclude expert testimony regarding the hierarchy, structure, and membership requirements of a gang.  Most of the Government's proffer concerns this type of testimony.  For example, Special Agent Ramos offers opinions about Nuestra Familia's written constitution, carnales' control of other incarcerated and unincarcerated gang members, assignment of particular jobs to Norteños in custody, and organization of Nuestra Familia into "regiments."  Ramos Ops. 6, 7, 12, 20.  Investigator Reyes offers many of the same opinions, in addition to others about organization of Norteños into different "hoods" and methods by which gang members can gain prestige.  Reyes Ops. 19, 20.  These opinions suffer from the problems identified above because they essentially "instruct[] the jury on the existence of facts needed to satisfy the elements" of the Government's RICO claim.  *Mejia*, 545 F.3d at 191.  The Government may establish these elements at trial through evidence and the testimony of fact witnesses.

For those reasons, the Court GRANTS Defendants' Motion to Exclude the following opinions:

- <u>Special Agent Ramos</u>:  opinions 2, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 20, 21, 23, 24, 25, 28
- <u>Investigator Reyes</u>:  opinions 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 19, 20, 21, 22

### C.  History, General Background, Alliances, and Rivalries

Special Agent Ramos and Investigator Reyes also offer opinions that chronicle the history of Norteños and Nuestra Familia and their alliances and rivalries.  These opinions, however, are neither relevant to the issues in this case nor reliable under Rule 702.  Wide-ranging historical testimony risks making the testifying officer "a chronicler of the recent past whose

pronouncements on the elements of the charged offense serve as shortcuts to proving guilt." *Cazares*, 788 F.3d at 977-78 (quoting *Mejia*, 545 F.3d at 190; *Williams*, 2016 WL 899145, at *8 (disallowing opinions about alliances and rivalries because they were "central factual issues with respect to many of the charges against the defendants," including "the murder in aid of racketeering charges); *Cervantes*, 2016 WL 491599, at *7 (disallowing opinions about the history of Nuestra Familia dating back to the 1960s).

Special Agent Ramos offers the bulk of the proffered opinions recounting the general history of Nuestra Familia and Norteños. For example, his first opinion provides factual background on the origination of Nuestra Familia in the late 1960s as a rival to *La Eme*. *See* Ramos Op. 1. His fourth opinion states that the majority of Nuestra Familia carnales had been placed in lockup units by the 1980s. *See* Ramos Op. 4. Investigator Reyes also provides general background on the Salinas and Monterey County Jail. *See* Reyes Op. 3. These opinions represent an effort to act as a "chronicler of the recent past" rather than a witness who has used his expertise to reach an opinion, and are in some cases irrelevant to the conduct that is the subject of the Indictment. *Cazares*, 788 F.3d at 977-78. These opinions, in the same way the opinions on hierarchy, structure, and membership requirements did, seek to establish certain central facts that the Government must prove beyond a reasonable doubt. The Court will allow only the most basic background information to come in through expert testimony.

For those reasons, the Court GRANTS Defendants' Motion to Exclude the following opinions:

- <u>Special Agent Ramos</u>:  opinions 1, 3, 4, 19, 22
- <u>Investigator Reyes</u>:  opinions 2 and 3

The Court DENIES Defendants' Motion to Exclude Investigator Reyes' opinion 1, which can serve as basic background. The Court will also allow Investigator Reyes to testify to opinion 17 and opinion 18—from "During the relevant time . . ." to ". . . the general prison population [of Norteños]." ONLY—and Special Agent Ramos to testify to opinion 29 because Defendants stated that they had no objection to those opinions.

17

## IV. ORDER

For those reasons, Garcia and Jasso's Motion to Exclude Expert Testimony is GRANTED IN PART and DENIED IN PART as outlined above. Special Agent Ramos and Investigator Reyes SHALL only testify in accordance with the rulings in this Order.

**IT IS SO ORDERED.**

Dated: October 7, 2021

_____
BETH LABSON FREEMAN
United States District Judge