UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>VINCENT GERALD GARCIA,<br>Defendant. | Case No. 18-cr-00466-BLF-2<br><br>**ORDER DENYING DEFENDANT GARCIA'S MOTION FOR NEW TRIAL** |

On June 7, 2022, a jury convicted Defendant Vincent Gerald Garcia of one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d), one count of conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5), and one count of conspiracy to commit assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(6). Garcia moves for a new trial under Federal Rule of Criminal Procedure 33, asserting that there was insufficient evidence to support his conviction and that the Court erred in allowing improper vouching testimony by a Government witness. ECF No. 885 ("Motion"). The Government opposes the motion. ECF No. 896 ("Opp.").

The motion is DENIED for the reasons discussed on the record and below.

**I. BACKGROUND**

*Charges*

The Indictment in this matter was filed on September 27, 2018. ECF No. 1 ("Indictment"). It charges fifteen individuals as members of a criminal enterprise, consisting of members and associates of the Nuestra Familia prison gang, and Norteño street gangs in Salinas, California and the surrounding areas (the "Enterprise"). Indictment ¶ 40. Among other activities, members and associates of the Enterprise are alleged to have committed crimes such as attempted murder,

1    narcotics trafficking, and other acts of violence. *Id*. ¶ 41.  According to the indictment, Norteño
2    gang members pledge their allegiance and loyalty to Nuestra Familia and are instructed on its
3    rules, rituals, and obligations. *Id*. ¶ 3.  Nuestra Familia enforces its rules and promotes discipline
4    among its members and associates by assaulting and threatening those individuals who violate the
5    rules or pose a threat to the organization. *Id*. ¶ 4.  Inside prison and local jails, all Norteños work
6    together to maintain the structure and follow the rules of Nuestra Familia. *Id*. ¶ 10.  Nuestra
7    Familia members and associates throughout the prison system and outside of prison communicate
8    through a variety of means, including secret notes called "kites." *Id.* ¶ 9.

9          In Monterey County Jail ("MCJ"), Norteños are separated from other inmates and are
10   housed together in certain housing units.  Indictment ¶ 25.  The indictment alleges that if a
11   member of the Enterprise commits a serious violation of the Nuestra Familia rules, he is subject to
12   "removal" from the housing unit at the jail. *Id*. ¶ 10.  The purpose of a "removal" is to remove an
13   inmate from the housing unit (and remove his status as a Norteño in general) by killing that inmate
14   or inflicting as much bodily harm as possible. *Id*. ¶ 34.  A "removal" involves the stabbing of the
15   target by at least one "hitter" followed immediately by a physical assault without weapons by at
16   least two individuals called "bombers." *Id*. ¶ 36.  The purpose of the subsequent beating is to
17   inflict maximum damage to the victim, while giving the hitters time to discard the weapon and
18   wash the blood off or change clothes. *Id.*  "Removals" are approved in advance by the Norteño in
19   charge of the facility (unless an emergency arises that requires an immediate removal) after receipt
20   of reports of the violations from members in the housing unit. *Id*. ¶ 10.  The "removals" are
21   planned out by the person in charge of a housing unit and members of that housing unit are aware
22   of the "removal" process, and they are required to assist in the removal if requested. *Id.*

23         According to the Indictment, Garcia became a member of a local Norteño street gang in
24   approximately 1977 and a member of the Northern Structure in at least 1987, and he was a carnale
25   of the Nuestra Familia and in charge of Salinas during the entire period of time for all of the
26   removals alleged in the indictment.  Indictment ¶ 43.  Garcia is charged with having ordered
27   various criminal activities in MCJ for the benefit and in furtherance of the Enterprise, including
28   attempted murder, assaults, and controlled substances offenses. *Id.*  According to the Indictment,

1   from at least May 23, 2013 through February 24, 2015, Garcia was the Authority in Charge of the
2   entire MCJ, where he was incarcerated. *Id.*
3       The charges in the indictment include:
4,5   • Count 1: 18 U.S.C. § 1962(d) – Racketeering Conspiracy (under Racketeer Influenced and Corrupt Organizations Act, ("RICO"))
6,7   • Count 2: 18 U.S.C. § 1959(a)(5) – Conspiracy to Commit Attempted Murder in Aid of Racketeering
8,9   • Count 3: 18 U.S.C. § 1959(a)(6) – Conspiracy to Commit Assault with a Dangerous Weapon in Aid of Racketeering
10,11   • Counts 4, 6, 8: 18 U.S.C. § 1959(a)(5) – Attempted Murder of Victims 5, 6, 7 (respectively) in Aid of Racketeering
12,13   • Counts 5, 7, 9: 18 U.S.C. § 1959(a)(3) – Assault of Victims 5, 6, 7 (respectively) with a Dangerous Weapon in Aid of Racketeering

Garcia was charged in counts one, two, three, four, five, eight, and nine.

*Trial*

Two Defendants, Garcia and Jorge Jasso, went to trial. *See* ECF No. 644 ("Gov't Trial Memo") at 1. Trial commenced with jury selection on May 12, 2022. *See* ECF No. 818. The Government proceeded to trial against Garcia and Jasso on only the first three charges from the Indictment. *See* Gov't Trial Memo at 1.

At trial, the Government presented several witnesses, among them those listed here. The Government presented the four cooperating witnesses discussed in Garcia's motion: Isidro "Pancho" Zavala, *see* Tr. Vol. 5 at 715, Vol. 6 at 892; Michael "Slim" Aguilera, *see* Tr. Vol. 7 at 1155, Vol. 8 at 1375; Richard "Junebug" Delgado, *see* Tr. Vol. 8 at 1426, Vol. 9 at 1628; and Israel "Shorteno" Cota, *see* Tr. Vol. 9 at 1718, Vol. 10 at 1854. The Government also presented several law enforcement witnesses, including Commander Ray Tongal (Monterey County Sherriff's Office), *see* Tr. Vol. 8 at 1417; Officer Ron Pemberton (Salinas Police Department), *see* Tr. Vol. 10 at 1847; and Special Agent Dustin McWhirter (FBI), *see* Tr. Vol. 10 at 1957, Vol. 11 at 2004. The Government also entered as evidence several kites. *See* Opp. Ex. B (several kites);

3

*see also, e.g.*, Tr. Vol. 11 at 2006 (discussing kites); Exs. 251.1, 252.1, 253, 254.1, 255.1, 258, 267.1, 274, 276, 277, 287, 288, 291, 293, 294, 297.1, 298, 299.1, 300.1, 301.1, 302, 306.1, 310.1, 314.1 (kites admitted as evidence). The Government also entered as evidence a phone call between Garcia and Cota while Cota was in MCJ and Garcia was not, *see* Opp. Ex. A (transcript of phone call); Exs. 90 (phone call), 91 (transcript), as well as a video of several MCJ inmates, including Garcia, interacting in the yard, *see* Ex. 87; Tr. Vol. 4 at 627-637 (discussing video).

Garcia mounted a defense on the basis that he had withdrawn from the conspiracy during the time period at issue in the case and that another individual, co-defendant Johnny Magdaleno, was leader of the Enterprise. *See* Motion at 3.

*Jury Verdict*

The jury returned unanimous guilty verdicts against Garcia on Count 1 (RICO conspiracy), Count 2 (conspiracy to commit murder), and Count 3 (conspiracy to commit assault with a dangerous weapon). *See* ECF No. 865. A sentencing hearing for Garcia was held on November 1, 2022. *See* ECF No. 895.

Garcia seeks a new trial under Rule 33.

## II. LEGAL STANDARD

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Ninth Circuit described the standard for granting a new trial in *United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992), which it reaffirmed in *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000):

> [A] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses. . . . If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Kellington*, 217 F.3d at 1097 (internal quotation marks and citations omitted). The court may consider evidentiary and procedural errors in weighing the motion for new trial. *See, e.g., United*

4

*States v. Tory*, 52 F.3d 207, 211 (9th Cir. 1995) (granting new trial in light of four erroneous evidentiary rulings); *see also United States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992) ("A new trial is only warranted on the basis of an incorrect evidentiary ruling if the ruling substantially prejudiced a party.").

### III. DISCUSSION

Garcia seeks a new trial on two bases, arguing first that there was insufficient evidence to support the jury's verdict, and second that a Government witness engaged in improper vouching. Motion at 7-10. The Court addresses these asserted errors in turn.

#### A. Sufficiency of the Evidence

Garcia argues there was "no evidence that he agreed to or participated in the conspiracies and offense conduct alleged," and that mere gang membership or presence at the crime scene is insufficient to support a conviction. Motion at 7-8. He focuses on his involvement in the conspiracy during the relevant time frame: December 2, 2012 through April 14, 2014. Indictment ¶ 59. First, with regard to the period before his arrest on May 23, 2013, Garcia argues that, although he was regarded by MCJ Norteños as Authority in Charge on the streets, there is insufficient evidence he was involved in the conspiracy. *Id.* at 9. While acknowledging that over 300 kites were found in his home on his arrest date, he argues there is no proof nor reasonable inference that he read or responded to the kites. *Id.* He also argues that while his phone call with Cota in December 2012 shows his involvement and authority in NF, it also shows he disagreed with Magdaleno's violent leadership style in MCJ. *Id.* On this basis, he claims he was not a member of the conspiracy pre-arrest. *Id.* He also argues he was not a member of the conspiracy after his arrest. *Id.* He claims there is no direct evidence that he agreed with or ordered removals while at MCJ. *Id.* For support, he points to a situation in which he showed animus towards a specific individual, and that individual was not removed until 8 months later, further arguing there is no evidence that he agreed to or was involved in that removal. *Id.* Finally, Garcia points to a recent Ninth Circuit case, *United States v. Mendoza*, 25 F.4th 730 (9th Cir. 2022), as standing for the proposition that, in the absence of a direct agreement, being a member of a gang/enterprise coupled with being a drug buyer is insufficient to prove agreement and/or participation in an

5

alleged conspiracy. Motion at 8.

The Government points to various sources of evidence, asserting each is independently sufficient to support the jury's guilty verdict as to all three counts: (1) the testimony of the cooperating witnesses, Opp. at 3-5; (2) the kite evidence, *id.* at 5-7; and (3) the testimony of the law enforcement officers, *id.* at 7. The Government also distinguishes the *Mendoza* case. *Id.* at 2. Finally, the Government asserts that Garcia did not and could not show he withdrew from the conspiracy. *Id.* at 8-9.

The Court finds that, weighing the evidence, it cannot say that the evidence preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred. *See Kellington*, 217 F.3d at 1097. To the contrary, the Court finds there is overwhelming evidence to support the jury's verdict, including the testimony of the four cooperating witnesses, the taped telephone call between Cota and Garcia, the kites, videos of Garcia in MCJ, and the testimony of Officer Pemberton and Commander Tongal.

First, all four cooperating witnesses stated Garcia was a carnale during the relevant time period. *See* Tr. Vol. 5 at 874:17-23 (Zavala); Vol. 7 at 1231:17-24, 1251:17-23 (Aguilera); Vol. 8 at 1477:1-8 (Delgado); Vol. 9 at 1731:22-1732:13 (Cota). Zavala testified that Garcia was in charge when in custody at MCJ, Tr. Vol. 5 at 874:24-875:1; had changed the daily routine, Tr. Vol. 5 at 870-872; and was not on freeze, Tr. Vol. 6 at 950:20-21. Zavala also testified about a kite that was being passed around the housing pod and skipped Garcia's cell. Tr. Vol. 6 at 949-951. He testified that a kite would only skip a cell if the cell was on freeze, the person in the cell already knew of the removal, or the person in the cell authorized the removal. *Id.* Zavala testified that Garcia was not on freeze, and that the removal had been authorized by a carnale. *Id.*

Cota testified that when he was "authority in charge" at MCJ in late 2012, he reported to Garcia (who was not in custody at the time) via phone or kites. Tr. Vol. 9 at 1753-1754. The audio of one of these phone calls was presented as evidence, *see* Opp. Ex. A; Exs. 90-91, and Cota discussed it during his testimony, *see* Tr. Vol. 9 at 1801-1808. During the phone call Cota informed Garcia that he was sending some kites out to him, including one about a recent removal. Opp. Ex. A at 3; Tr. Vol. 9 at 1801-1803. On the phone call, they also discussed who would take

6

1  over leadership in MCJ when Cota left, Opp. Ex. A at 7; Tr. Vol. 9 at 1807, as well as the proper
2  removal process, Opp. Ex. A at 8; Tr. Vol. 9 at 1807-1808.

3  Next, the kites found at Garcia's residence also support the jury's verdict. *See* Opp. Ex. B.
4  The jury heard testimony that 312 kites were found at Garcia's residence on the date of his arrest
5  in May 2013, Tr. Vol. 4 at 578-594, Vol. 6 at 1100-1103, and several of these kites were admitted
6  into evidence, *see* Opp. Ex. B. The contents of the kites, namely incident reports about removals,
7  as well as a roster of current gang members in MCJ and information about a member's promotion
8  within the gang, tie Garcia to the conspiracy. *Id.* The Government also showed at trial a video of
9  Garcia and other Norteños/NF members and associates in the yard at MCJ. Ex. 87; *see* Tr. Vol. 4
10 at 627-637 (testimony of Monterey County Sheriff Department gang investigator about video).
11 The video shows Garcia interacting with other Norteños, including Johnny Magdaleno, and thus
12 contradicts Garcia's assertion that he was on freeze. *See id.*

13 Finally, the Court looks at Garcia's statements to police officers. On March 4, 2013,
14 Garcia was pulled over by Officer Pemberton for a traffic violation and stated that he was "NF."
15 Tr. Vol. 10 at 1849:4-15. Then on February 21, 2015, Garcia spoke with Commander Tongal at
16 MCJ, admitted that he was a Nuestra Familia member, and informed him that there would be a
17 power struggle once he left MCJ. Tr. Vol. 8 at 1419-1422. Tongal also testified that in late 2014,
18 he had asked Garcia and Magdaleno to help with some issues the staff was having with Norteño
19 inmates. Tr. Vol. 8 at 1422-1423. After Garcia and Magdaleno spoke to them, the problems
20 stopped. *Id.*

21 In contrast, there is minimal evidence that Garcia was on freeze—two of the cooperating
22 witnesses, Zavala and Cota, stated that they had heard rumors that Garcia was on freeze. *See* Tr.
23 Vol. 6 at 1086-1088 (Zavala); Vol. 10 at 1902-1903 (Cota). Given all of this evidence, a complete
24 review of the record here does not leave the Court with "a strong doubt as to the defendant's
25 guilt." *See United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999).

26 Further, the Court finds Garcia's reliance on *Mendoza* unpersuasive. *See* 25 F.4th 730. In
27 discussing *Mendoza*, Garcia twice mentions that there is no "direct evidence of [his] agreement" to
28 participate in the conspiracy. Motion at 2, 8. But the Ninth Circuit in *Mendoza* made clear that

7

1    "[c]ircumstantial evidence can suffice to prove a conspiracy." 25 F.4th at 736 (citing *United*
2    *States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009)). As to Garcia's argument that the
3    circumstantial evidence was insufficient, *see* Motion at 2, the Court finds that it was sufficient for
4    the reasons outlined above. Finally, Garcia argues that *Mendoza* stands for the proposition that in
5    the absence of a direct agreement, being a member of a gang coupled with being a drug buyer is
6    insufficient to prove agreement with and/or participation in an alleged conspiracy. Motion at 8.
7    While the factual circumstances in that case were different, as the conspiracy was tied to drug
8    distribution, the Court notes that, if anything, a comparison of the evidence at issue here to that in
9    *Mendoza*, *see* 25 F.4th at 736-40, only strengthens the Court's conclusion that there was sufficient
10   evidence to support the jury's verdict.

11   Finally, while Garcia frames his argument as insufficiency of evidence to show he was in
12   the conspiracy, the Government further argues that Garcia did not show he had withdrawn from
13   the conspiracy. "A conspirator can withdraw from a conspiracy by: (1) disavowing the unlawful
14   goal of the conspiracy; (2) affirmatively acting to defeat the purpose of the conspiracy; or (3)
15   taking 'definite, decisive, and positive' steps to disassociate himself from the conspiracy." *United*
16   *States v. Fox*, 189 F.3d 1115, 1118 (9th Cir. 1999) (quoting *United States v. Lothian*, 976 F.2d
17   1257, 1261 (9th Cir. 1992)). The Court agrees that even if Garcia had shown he was "on freeze,"
18   such a showing would not meet the above standard for withdrawal from a conspiracy.

19   Relying on the identified evidence and having reviewed the entirety of the trial evidence,
20   the Court does not find that the evidence preponderates sufficiently heavily against the verdict
21   such that a miscarriage of justice may have occurred. *See Kellington*, 217 F.3d at 1097.

22   **B.    Vouching**

23   Garcia next argues that the Court erred by allowing a Government witness to improperly
24   vouch for the credibility of other witnesses. Motion at 9-10. Garcia points to the testimony of
25   FBI Special Agent Dustin McWhirter, who testified as follows:

> Q: And during the course of the debriefings [with the testifying cooperating witnesses] did you do anything to try to verify information that was being given to you in debriefs?
> A: Yes.
> Q: What would you do?

> A: Any event that was identified during the interview, we would try to verify that event, whether it would be through Monterey County Jail records, police reports, CDCR reports, criminal histories, D and D checks, those types of things.
>
> . . .
>
> Q: Based on the information that you had gathered in the debriefing process, what did you do from there?
> A: Based off of that information, most of it was trying to confirm and validate the information that was given, see which statements or individuals talked about the same event, and try to verify maybe who was involved or what was being said was correct.

Tr. Vol. 10 at 1966:17-25, 1967:20-1968:1; Motion at 7. Garcia argues that this testimony constituted improper vouching because the Agent "vouch[ed] for the reliability and credibility of its four cooperating witnesses." Motion at 2.

"Improper vouching occurs when the prosecutor places the prestige of the government behind the witness by providing personal assurances of the witness's veracity. Improper vouching also occurs where the prosecutor suggests that the testimony of government witnesses is supported by information outside that presented to the jury." *United States v. Stinson*, 647 F.3d 1196, 1212 (9th Cir. 2011) (quoting *United States v. Wright*, 625 F.3d 583, 610 (9th Cir. 2010)). It can "occur through the prosecutor's own vouching remarks or when the prosecutor elicits vouching testimony from witnesses." *Id.* (quoting *Cheney v. Washington*, 614 F.3d 987, 996 n.4 (9th Cir. 2010))

Garcia argues that by offering testimony of the "'prestigious' and persuasive lead [FBI] Special Agent," the Government improperly put its prestige behind the cooperating witnesses. Motion at 9-10. Garcia argues that the Agent's testimony was "directly after [the Government's] four cooperating witnesses testified," and also right after defense counsel attacked the credibility of those witnesses on cross-examination. *Id.* at 10. Garcia asserts that the Agent's testimony "was prejudicial and inappropriate vouching" and that the Court should have excluded it. *Id.* The Government responds that there was no improper vouching. Opp. at 9-10. The Government asserts that it asked the Agent only what steps the FBI took to verify information and that he did not make any improper conclusions about the truthfulness of the witnesses' testimony. *Id.* at 10.

Defense counsel raised this issue during trial. *See* Tr. Vol. 11 at 1983-1985. The Court denied the request to strike the identified portions of the testimony, stating that the witness could

summarize the investigation, but that the witness could not "go the next step of saying that 'I then believe the [cooperating] witness' or 'I determined that the [cooperating witnesses'] statements were accurate.'" Tr. Vol. 11 at 1985:10-16. The Court made clear that the witness could not have made a conclusory sentence stating his determination about the accuracy of the cooperating witnesses' testimony, but he was allowed to recite the steps taken as part of a thorough investigation, especially as such testimony can be required to prevent the problem of an inadequate investigation. Tr. Vol. 11 at 1985:17-22.

The testimony properly goes only to the reasonableness and thoroughness of the Government's investigation and does not cross the line to vouching. The Court finds it did not err in its determination at trial. If the Agent had testified as to the honesty or veracity of the cooperating witnesses, that would have constituted vouching. But the Agent did not do so. The Agent never made statements as to the accuracy of the cooperating witnesses' testimony. Therefore, the Court did not err in allowing the identified testimony from the Agent.

### C. Conclusion

The Court finds that Garcia has failed to demonstrate an insufficiency of evidence or evidentiary error that would warrant a new trial. Consequently, his motion for new trial is DENIED.

## IV. ORDER

(1) Garcia's motion for new trial is DENIED.

(2) This order terminates ECF No 885.

Dated: November 3, 2022

_____
BETH LABSON FREEMAN
United States District Judge

10